WILLIAM R. NELSON v. BERNARD ALPORT
et al.; LENA ALPORT, Appellant.

Division Two, July 14, 1914.

CONVEYANCE: By Married Woman with Husband: Fraud: Evidence. Evidence *held* to support a finding that a conveyance of land was valid, having been signed and acknowledged by the grantor, a married woman, without fraud or coercion.

Appeal from Jackson Circuit Court—*Hon. W. O. Thomas,* Judge.

AFFIRMED.

*T. A. Frank Jones* for appellant.

(1) It being conclusively proven that appellant at the time she signed the deed sought to be set aside refused to acknowledge it and declared it was not her free act and deed, the burden of proof as to any subsequent acknowledgment is upon the respondent. (2) The evidence does not justify the finding that appellant acknowledged her signature to the deed. (3) Such finding, if justified, is not decisive of any material issue in the case. (4) When respondent's agents requested appellant to sign the deed and informed her that they had brought the money due under the contract for payment or tender, and when she refused to make the deed, that was a sufficient tender in law. Stephenson v. Kilpatrick, 166 Mo. 262. When they insisted upon displaying and counting the money, at the same time declaring to appellant that the contract was binding on her and threatening her with the consequences of a lawsuit, they went beyond their rights, and their statements so made to her should be held as representations, and any benefit or advantage obtained by such means should be critically

examined.  (5)  The evidence justifies the conclusion that respondent's agents made the tender in gold in the expectation thereby to unduly influence the mind of appellant and her husband; and, in any case, they observed that the display of the gold did have such an effect upon appellant's husband as to make him eager to give the deed which he had at first refused, and made use of his influence and authority with appellant to obtain her signature to the deed; and by reason thereof respondent is answerable for any undue or unfair influence exerted upon appellant resulting from the display of the gold.  (6)  While the argument about giving the deed was pending, respondent's attorney caused one Mr. Hock to be sent for as appellant's attorney with the knowledge that he was favorable to respondent's pretensions with respect to the deed, and respondent is therefore answerable for any undue influence exerted upon appellant's mind by Mr. Hock.  (7)  The combined influences brought to bear upon appellant with respondent's connivance as shown by the evidence subdued appellant's will to such an extent that in signing the deed she acted under moral duress, and it should be set aside.  Sharpe v. McPike, 62 Mo. 301; Bell v. Campbell, 123 Mo. 1; Berlien v. Bieler, 96 Mo. 491; Turner v. Overall, 172 Mo. 271; Benn v. Pritchett, 163 Mo. 560; Hensinger v. Dyer, 147 Mo. 219; Davis v. Luster, 64 Mo. 43; Stonemets v. Head, 248 Mo. 243; Turley v. Edwards, 18 Mo. App. 682.  (8)  In the circumstances of this case no actual tender by appellant was necessary; the offer in the cross-bill to repay the money satisfies the requirements of the law.  Deichman v. Deichman, 49 Mo. 107; Hogan v. Bank, 182 Mo. 319.

*Watson, Watson & Alford* for respondent.

(1)  The judgment is for the right party, for the reason the plaintiff dismissed his suit in ejectment,

and when that was done there was no authority under the statute for filing the so-called amended counterclaim. R. S. 1909, sec. 2386; Bliss on Code Pleading, sec. 367. (2) The so-called counterclaim is not a counterclaim authorized by the statutes of Missouri, but is an entirely separate cause of action existing primarily against a party not a party to the suit when petition was dismissed, and under such a pleading relief must primarily be held against such third party. R. S. 1909, sec. 1807; Jones v. Moore, 42 Mo. 413. (3) Under the pleadings and evidence appellant was not entitled to rescind the contract and cancel the deed and the judgment of the court was for the right party. (4) There was no fraud practiced on appellant by Ennis and no moral duress was shown and the judgment of the court should be sustained. (5) There was no offer to return the money received or to put the respondent *in statu quo,* and appellant was not entitled to any equitable relief. Mastin v. Grimes, 88 Mo. 490; Smith v. Melton, 65 Mo. 315; 39 Cyc. 1378; Frink v. Thomas, 20 Ore. 265; Powell v. Plant, 23 So. 399; Vance v. Newman, 72 Ark. 359; Neal v. Reynolds, 38 Kan. 435; Drew v. Pedlar, 87 Cal. 443; Breyfogle v. Walsh, 80 Fed. 172; Wiell v. Malone, 159 N. Y. 523. (6) There was no moral duress shown in this case, and this case does not fall within the class of cases cited in appellant's brief. (7) Ennis was not respondent's agent in the purchase of property from appellant.

WILLIAMS, C.—This suit was originally instituted by the plaintiff's filing in the circuit court of Jackson county, Missouri, his petition in ejectment against Lena Alport and her husband Bernard Alport to recover the south one-half of lot 383, block 29, in McGee's Addition to Kansas City, Missouri; the property was known as No. 1731 Grand Avenue, Kansas

City, Missouri. Defendants filed answer asking for affirmative equitable relief. It appears that some time after the suit was originally instituted plaintiff instituted in a justice of the peace court in Kansas City a suit in unlawful detainer to recover from the defendants the possession of the same property. Thereafter plaintiff in attempting to dispose of the case in the circuit court dismissed his petition, but the court, over the objection of plaintiff, refused to dismiss the answer of defendant on the ground that it asked for affirmative relief. Thereafter plaintiff filed a reply to the amended answer of defendants. Later defendant Lena Alport filed her separate amended answer and cross-bill undertaking to make H. R. Ennis and one T. H. Thompson defendants in the cause. Unsuccessful motions were made by the plaintiff and defendants Ennis and Thompson to strike the cross-bill from the files. Later plaintiff filed a reply to the separate amended answer of the defendant Lena Alport and it was upon the issues thus raised by the answer of defendant Lena Alport and plaintiff's reply thereto that the trial was had in the circuit court. By her separate amended answer and cross-bill, defendant Lena Alport in substance alleged: (1) That on June 5, 1908, she was the owner of the above mentioned real estate and on that day signed and delivered a contract by which she agreed to sell said real estate to defendant Torrey H. Thompson for the sum of $20,000, one thousand dollars of which was recited in said contract to have been deposited with H. R. Ennis & Co. (as agents of defendant), to be applied on the purchase price; fourteen thousand dollars in cash upon the delivering of a general warranty deed to said property; said property to be conveyed subject to a deed of trust which was then on the property amounting to the sum of five thousand dollars and also subject to State and county taxes; that said contract further provided that

defendant might remain in possession for two months from the date of the delivery of the deed, at a monthly rental of $25; (2) that the making of said contract was procured by fraud on the part of plaintiff and defendants Ennis and Thompson in this—that said Ennis was engaged in the real estate business in Kansas City under the name of H. R. Ennis & Company and that said company assumed to act as agents of this defendant and accepted the deposit of one thousand dollars on the purchase price on behalf of this defendant when the said Ennis was in fact the agent of the plaintiff for the purpose of purchasing the above described property; that said Thompson was associated with defendant Ennis and aided Ennis in procuring said contract; that defendant Ennis concealed that he was the agent of plaintiff and made defendant an offer of twenty thousand dollars for the property as coming from the defendant Thompson; that defendant refused to accept said offer but offered to sell the same for twenty-five thousand dollars; that said Ennis in order to deceive and defraud said defendant, Lena Alport, represented that if she would sell her said property for the sum of twenty thousand dollars, he, the said Ennis, would cause to be sold to her the south half of lot 377 in McGee's Addition to Kansas City, Missouri, known as 1707 Grand Avenue for the sum of eighteen thousand dollars; that the premises numbered 1707 Grand Avenue were in the same block as defendant's above described property and of the same dimensions as defendant's property and the improvements thereon were as good or better than those upon defendant's lot; that thereupon said Ennis prepared and presented to her and her husband for their signature the written contract for the sale of defendant's property as above mentioned; that defendant and her said husband were unable to read or write in the English language and that defendant relied upon the honesty and good faith

of defendant Ennis and signed the above mentioned
contract by making her mark thereon, believing that
it was a proper and necessary step for carrying out
and effecting the exchange of properties in accordance
with the offer made to her by defendant Ennis; that
after she and her husband had signed the above
mentioned contract said Ennis refused to make a con-
tract to sell the property at 1707 Grand Avenue for
the sum of eighteen thousand dollars; that said Ennis
and Thompson were the agents of the plaintiff and
that the recital in said contract that H. R. Ennis &
Company were the agents of defendant was false;
that the one thousand dollar deposit mentioned in
said contract was never in fact made; that defendant
never intended to make a contract of the above import
and effect but that her signature was obtained thereto
by the fraud and misrepresentations above mentioned
and for that reason the same ought to be set aside
and held as fraudulent and void; (3) that after-
wards in order to make this defendant perform the
fraudulent contract above mentioned said Ennis with
three other persons came to plaintiff's home and pre-
sented to her a warranty deed for her signature which
the defendant refused to sign; that said Ennis told
defendant that if she refused to execute the deed he
would have the deed of trust on her property fore-
closed and the property sold so that the same would
become wholly lost to the defendant; that he induced
defendant's husband to join with him in endeavoring
to force defendant to execute said deed; that at said
time defendant was in a sick and weakened condition
and unable to cope with said Ennis and other persons
to protect her rights and to withstand the threats and
statements of said Ennis and her said husband and
that by reason of the same, she, jointly with her hus-
band, executed said warranty deed whereby she con-
veyed said property to said Ennis for the sum of
fifteen thousand dollars in cash and subject to the said

deed of trust for five thousand dollars but that the same was not her free act and deed and that this defendant was coerced, overreached and defrauded into executing said deed; that in all the matters and things aforesaid Ennis was the agent and acting for the plaintiff; that at the time said deed was executed said Ennis paid to defendant's husband fifteen thousand dollars; which sum defendant is ready and willing to repay said Ennis or to the plaintiff and now offers to pay the same as the court may adjudge or to pay the same into this court upon its decree setting aside said deed and contract; that afterwards said Ennis conveyed said property by warranty deed to the plaintiff herein. (4) The prayer of the answer was that the above mentioned contract and deeds be set aside and that the title to said property be adjudged and decreed to be in this defendant and for such further relief as may be just and equitable in the premises.

The reply contained in substance the following allegations: (1) General denial, except that it admitted that defendant and her husband conveyed said real estate to the said H. R. Ennis for the sum of fifteen thousand dollars in cash subject to said mortgage of five thousand dollars; (2) that on the 24th day of June, 1908, defendant sold and conveyed said real estate to said H. R. Ennis for the above mentioned sum and that said H. R. Ennis by warranty deed conveyed said property to said plaintiff herein at and for the same consideration; that plaintiff is now the owner in fee of said property; that immediately after plaintiff purchased said property he rented said premises to defendant and her husband at and for the sum of twenty-five dollars a month and that said defendant occupied said premises as tenants of the plaintiff and paid rent therefor as such tenants up to and including March 24, 1909, when defendant and her husband refused to make further payments of rent and

refused to give up possession of said premises; (3) that defendant and her said husband have ever since kept and retained said sum of fifteen thousand dollars and have never made any lawful tender thereof to plaintiff herein; that prior to the time defendant and her husband executed the said deed they had full knowledge of all their alleged rights, if any they had to have said deed set aside but never asserted said rights or any claim in that behalf until long after May 1, 1909, and that by reason thereof they are estopped to assert any right to set aside said deeds; that defendant's claim is wrongful and malicious and without any foundation in fact and prays that judgment be entered against the defendants adjudging that they have no right, title or interest in or to said premises or to have said deeds set aside and that judgment be entered that plaintiff has the right to the immediate possession of said premises and that defendants be compelled to surrender said premises to the plaintiff and that plaintiff be allowed damages and for such other relief as to the court may seem meet and just in the premises.    Trial was had in the circuit court resulting in a judgment in favor of plaintiff and against the defendants.    The trial court found that on June 24, 1908, defendant and her said husband conveyed said property to H. R. Ennis for the sum of twenty thousand dollars, fifteen thousand dollars of which was paid in cash and the remaining five thousand paid by the assumption on the part of said Ennis of the five thousand dollar mortgage then existing on said property, and that on said date said Ennis conveyed said property to said plaintiff herein and that plaintiff since that time has paid off said mortgage; the court further found that said Lena Alport signed the deed to Ennis and acknowledged the same as her free act and deed and that no fraud was practiced on her by said Ennis or said plaintiff or his agents in securing her signature to the deed. The

court further found that the plaintiff was the owner
of, and entitled to the immediate possession of, said
real estate; that defendants were not entitled to have
said deeds set aside or entitled to remain in possession
of said premises; that defendant's amended answer
and counterclaim be dismissed and that plaintiff re-
cover his costs.

The record is voluminous and the testimony very
conflicting.

Defendants' testimony concerning the decisive
issues in the case was substantially as follows: Mrs.
Alport testified in her own behalf stating that she was
thirty-nine years old; was born in Russia but had lived
in the United States twenty-four years; that in June,
1908, she owned the real estate in controversy; that
she and her husband used the property as their home
and also conducted a new and second-hand store busi-
ness on the premises; that she and her husband had
been in the second-hand business together for about
twenty-three years; that a few days before June 5,
1908, Mr. Ennis and Mr. Thompson called at her place
of business and asked for a price upon her said prop-
erty; she told them she would not take less than
twenty-five thousand dollars; that Mr. Ennis offered
her twenty thousand dollars and she refused the offer;
that Mr. Ennis then told her that the property at No.
1707 Grand Avenue, which was in the same block as
her property, was the same sized lot and had better
improvements on it than her own, could be purchased
for eighteen thousand dollars and that Mr. Ennis made
the proposition that if she would sell her property
to him for twenty thousand dollars he would sell the
property at 1707 Grand Avenue to her for eighteen
thousand dollars; that she accepted this last propo-
sition; that Mr. Ennis agreed with her that he and
her husband would go down to an attorney's office,
that of Mr. Leon Block, and have two contracts drawn,
one providing for the sale of her property to Ennis

and the other providing for the sale of the property at 1707 Grand avenue to her; that she understood Mr. Ennis was the buyer of her property but that he did not mention anybody as being the buyer; that thereupon Mr. Ennis and her husband went away saying that they were going down to Mr. Block's office to have the contract drawn; she later went to Mr. Block's office and found nobody there but the office girl. She received a telephone call to come home and when she arrived home she found Mr. Thompson and another young man there; that Mr. Thompson told her that he had the contract ready to sign and that she signed the contract; that after signing the contract she said to Mr. Thompson: "Where is my contract?" and Thompson replied: "It is too late, you can't get it." That when she signed the contract Mr. Ennis said: "Please don't tell anybody. Keep quiet." That Mr. Thompson read the contract over to her but that she didn't understand what half of it meant; that when she signed this contract she thought she was going to get a contract so that she could purchase the property at 1707 Grand Avenue and that otherwise she would not have sold her property. That when Mr. Thompson told her it was too late for her to get the other property she thought to herself that she "would not give him the abstract" but that finally her husband went down to the "mortgage man" and gave Mr. Thompson the abstract; that she had no further talk with Mr. Thompson or Mr. Ennis until they afterwards came down to her place of business to get her to sign the deed. On this occasion, Mr. Ennis, Mr. Thompson and two other gentlemen came to her place of business about eleven o'clock in the morning, carrying a satchel, and Mr. Ennis said, "Here is $20,000," and opened the satchel and spread the money, which consisted of gold pieces, out on the floor of the store. That she did not touch the money and did not want her husband to touch it; but that they asked her hus-

band to count the money and helped count it; that Mr. Ennis and Mr. Thompson said: "Mrs. Alport you have got to sign a deed. We have got a contract and we will go by law you should sell it; we will make you sell it." And one of them said that "they had plenty of money to file suit" and another said they would close me out and I would lose my property and I didn't know what to do. That she said to them: "I won't sign the deed because you've fooled me and I don't want to sell it and I will not sell it for anything." That her daughter, Mrs. Peltzman, was in the store when the gentlemen came and later Mrs. Peltzman's husband came to the store. Later a Mr. Hock came to the store (it will appear later that Mr. Hock was an attorney officing in Mr. Block's office and was the notary who took the acknowledgment to the deed); that she didn't know why Mr. Hock happened to come to the store but that he told her she should sign the deed and get through with it; that during the time the money was on the floor the front door to the store was locked; that she was sick and did not know what to do but that Mr. Hock said: "Well, do it anyhow, Mrs. Alport, sign the deed and get through, I can't stay here all afternoon;" that Mr. Hock was not representing the four gentlemen and was not representing her; that her husband urged her to sign the deed and said to her: "You are sick and I am going away to leave you with the children and I will go away and you can do anything you want;" that finally she took hold of the pen and made her mark and Mr. Hock said: "Mrs. Alport, will you swear?" and, "Do you sell of your free will?" and I said, "No, sir," and then he said: "Gentlemen, she don't sell with a free will," and the other gentleman says, "Never mind, we got her signature anyhow." After that Mr. Ennis and Mr. Thompson, my husband and my son-in-law all went to the bank with the money; that she did not want to go to the bank, but that her daughter said,

"Mama, papa says he is going to leave you," and for that reason her daughter made her go, that she went down to the bank but did not touch the money and did not care for it; that she did not authorize Mr. Ennis's firm to receive one thousand dollars for her upon the contract; that she did not pay Mr. Ennis or any one else any rent on the place after the deed was made; that the first time she knew any rent was being paid was when notice was served upon her to move out and that she sent Mr. Nelson and Mr. Ennis a letter which she had her daughter write for her and which she had sworn to before a notary public. The letter here referred to was as follows:

"Kansas City, Mo., Oct. 12, '08.
Messrs. H. R. Ennis & Co.,
Dear Sirs:

I will not give up possession of premises No. 1731 Grand Avenue until you pay me the other five thousand dollars. You know, as well as I do, that the sale was as is no sale, that you forced me to sell against my wish, in fact cheated me out of my home. You also know that my original price was twenty-five thousand dollars, and as I understood the contract to read the price was to be twenty thousand dollars net, you to pay the mortgage of five thousand. You seemed to think me an unimportant personage, bargaining with Mr. Alport, and even sending me, the owner, into the kitchen. You threatened me with suit at the time, and thought you would scare me, but I never was scared, and wish I had let you file suit. Now what I have to say is that if you want a clear deed and title to that property you will obtain it only by paying me the remaining five thousand dollars. You will want possession of the place, but you will never get it for I am prepared to stay here until this matter is settled in a satisfactory way. I know you will file suit for ejecting me, but there is where trouble

Nelson v. Alport.

will start for you, for I will carry this affair on from court to court, even to the Supreme Court of the United States. I don't care if it takes one hundred years to come to a close, and if I don't get it settled, my children or grandchildren will. No amount of litigation will make me give up my home unless I get the remaining money. If you don't want to do this, I can return the fifteen thousand dollars you gave me at any time. Then you will not get it even for Fifty thousand dollars. I don't want you to think that this is the last of this affair as I mean all that I say or write. Respectfully,

her
LENA X ALPORT.
mark

Witnesses.

M. FINKELSTEIN,

I. PELTZMAN.

Subscribed and sworn to before me this 12th day of October, 1908. H. RUBENSTEIN,
(Seal) Notary Public.

My commission expires May 14, 1911.''

The witness further testified that the fifteen thousand dollars was deposited in her husband's name. On cross-examination she testified that Mr. Thompson never did offer to give her twenty-five thousand dollars for her property but that they offered to give her twenty thousand dollars for her property and sell her the property at 1707 Grand avenue for eighteen thousand dollars but never offered to sell her the property after that time. That at the time she and Mr. Ennis came to terms about the sale of the property, Mr. Ennis asked who their lawyer was and defendant's husband said, ''Mr. Block,'' and thereupon Mr. Ennis agreed that they would go to Mr. Block and have him draw up the contract; that she did not know that Mr. Hock worked in Mr. Block's law office. She further testified that at the time she signed the deed she was not scared about what Mr. Ennis said about

his going to sue her but that she was scared on account of her husband's saying he was going to leave her. She was asked if she was willing to trust her husband with the fifteen thousand dollars. The only answer that she would make to this question was, "He had it in the bank;" that afterwards her husband bought some property on 18th street and had the deed made in her name. When asked if her husband used a part of the fifteen thousand dollars that was in the bank to buy this property she answered: "I don't know, I guess he did." She further testified that when she went before the notary and took an oath as to the contents of the letter above copied she knew what was in the letter. She further testified that Mr. Block had acted as her attorney on one prior occasion when she purchased some property. William R. Nelson, the plaintiff, was called as a witness for the defendant and testified as follows: That he was the grantee in the deed whereby Mr. Ennis and wife conveyed to him the property in question for a consideration of twenty thousand dollars; that sometime before the purchase of this property he requested Mr. Ennis, who was a real estate dealer, to come to his office, and stated that he was desirous of finding a new location between Seventeenth and Eighteenth or between Sixteenth and Seventeenth streets and desired a strip three hundred feet wide running from street to street in any one of those blocks. At this time Mr. Nelson stated to Mr. Ennis the price that he would be willing to give for such a location and told Mr. Ennis that he did not care to have the matter advertised or as stated in the witness's language: "We didn't care to put it on the bill board." That he fixed a price above which he would not go and that he was not to pay Mr. Ennis any commission and did not pay him any commission but that Mr. Ennis was to get his commission from the people who sold their property and that Mr. Ennis was not in any sense "our agent;" that he did not

hear of the tender of fifteen thousand dollars in gold until after it was made; that he called upon Mr. Ennis to find this property for him because he understood that Mr. Ennis handled considerable property in that locality. The witness did not know anything about the terms of the transaction but stated that those matters were attended to by his employee, Mr. Seested. Mr. Seested was called as a witness for the defendant and stated that he was in the employ of Mr. Nelson at the time of the purchase of the property for the new site and stated that after Mr. Ennis would make purchases of properties and make first payments on the same, Mr. Nelson would reimburse him for the outlay; that Mr. Ennis was not to receive any compensation from Mr. Nelson for the purchase of this property; that Mr. Charles H. Adams, an attorney, examined the abstracts of title to the respective pieces of property for Mr. Nelson. This witness testified to the prices given for several of the other lots which were included in this three hundred foot strip purchased for the new site and from this evidence it appears that some of the properties cost more than was given for defendant's property and some of the properties were purchased at a less figure but it appears that the price paid to defendant was at least an average, if not a little above the average price paid for all of the properties on Grand avenue.

Meyer Peltzman, son-in-law of Mrs. Alport, testified for the defendant that he was present when Mrs. Alport executed the deed on June 5, 1908; that he arrived at the store about 12:30 p. m., and Mrs. Alport was behind a desk back of the counter and her husband was on the floor counting the gold; that Mrs. Alport kept telling her husband to leave the money alone but that he kept counting it and seemed excited. That when they got through counting the money, Mr. Ennis and the other gentlemen asked Mrs. Alport to sign the deed but she refused to sign it;

that later Mr. Hock came to the store but the witness said he didn't know why Mr. Hock happened to come; that Mr. Ennis and the other gentleman kept asking Mrs. Alport to sign the deed and told her that she had her money and everything else and the best thing she could do would be to sign because "it would be just a lot of trouble, lawsuits and one thing and another and the best you can do is to sign it and settle it up." And that Mr. Hock said, "You had better sign the deed. You have got the money and everything straightened up and you will have lawsuits and one thing and another." That finally they persuaded her to sign the deed and that then Mr. Hock wanted her to acknowledge the deed as of "her own free will" and Mr. Ennis asked her to swear it was of her own free will but she refused "to swear" and Ennis said: "Well, leave it go at that, she didn't have to swear to it." That before the deed was signed Mrs. Alport and her husband conversed with each other in the Hebrew language and Mr. Alport told her that if she was not going to take the money and sign the deed, "he was going to leave, leave her with the children." The witness stated that he did not telephone for Mr. Hock to come down to the store and did not know why Mr. Hock came down to the store or who sent for him; that he did not hear Mr. Adams state that he "would not accept any deed that this woman would not acknowledge to be her free act and deed;" the witness stated that he went with them when they took the money to the bank out of curiosity; that he went with his father-in-law but did not remember whether Mrs. Alport went to the bank or not; that he saw the fifteen thousand dollars counted out at the bank and put in a safety deposit box. Mrs. Fannie Peltzman, daughter of Mrs. Alport, testified that she was present when her mother signed the contract for the sale of the lot and that she signed her mother's name to the contract (her mother signed by mark); that

she was also present when her mother signed the deed. She corroborated her mother's testimony and her husband's testimony concerning the exhibit of fifteen thousand dollars in gold and stated that she did not know why Mr. Hock happened to come to the store and take the acknowledgment of the deed but that she did not think he was called by her father, mother or her husband. She further corroborates the testimony of her mother and witness's husband as to the conversation occurring at the time the deed was signed; that one of the men and Mr. Hock said to the witness: "Well, Mrs. Peltzman, you just write her (Mrs. Alport's) name down." Witness said she did so because she wanted to be "respectful." She said that the reason her mother gave for not wanting to sign the deed was that she wanted that place up on Seventeenth street, or else she wanted twenty-five thousand dollars. The witness corroborated her mother's testimony concerning the agreement reached between Mr. Ennis and Mrs. Alport prior to the execution of the contract for the sale of this land and that when Mr. Thompson brought the contract for Mrs. Alport's signature he asked the witness to keep the sale secret. That he handed Mrs. Alport the contract but Mrs. Alport could not read English and handed the contract to the witness; the witness started to read the contract but Mr. Thompson took the contract out of her hands and went up toward the front of the store and read it so fast that the witness did not think that her mother understood a word of it; that after the contract was signed, Mrs. Alport asked Mr. Thompson for the other contract and that Mr. Thompson said: "It's too late, Mrs. Alport, I'm sorry." On cross-examination the witness testified that she wrote the letter which her mother sent to Mr. Ennis and Mr. Nelson; that she suggested to her mother to write this letter because she thought perhaps Mr. Nelson did not know anything about the

trick that had been played on her mother. When asked why she did not say anything in the letter about not getting the property at 1707 Grand avenue, she said that her mother did ask her to put that in the letter but she replied to her mother: "There is no use giving them your secrets." When asked if her mother was scared at the time she signed the deed conveying the property to Ennis she said: "She wasn't exactly scared. She was very much wrought up. Well, she wasn't scared about the deed or anything like that you know. She didn't want to sign that deed. I don't know what was in her mind. She wasn't scared at their threats but she was scared when papa said he was going away." That was the only thing that scared her. She said her father got excited over the fifteen thousand dollars in gold. Before the contract was signed she heard her father say, "Go up to Mr. Block and have the contract drawn," and that the men folks went up and that her mother went afterwards. The evidence on behalf of plaintiff Nelson and defendants Ennis and Thompson was substantially as follows: Charles H. Adams, attorney at law, testified that he was employed by Mr. Nelson to pass upon the abstracts to the various lots purchased by Nelson; that he was present at Mrs. Alport's place of business the day the deed from Mrs. Alport and husband to Ennis was executed; that he went down there at the request of Mr. Ennis; that before going down Mr. Ennis told the witness that Mrs. Alport and husband had refused to make a deed to the property and asked Mr. Adams what they should do in the matter. That he told them the only thing they could do was to make a legal tender. The witness told Mr. Ennis that he had better make the tender in gold so there could be no question about it. Upon reaching Mrs. Alport's place of business, the witness told her that they had come to make a legal tender of the amount due under the contract and to demand a deed to the property;

that defendants refused to make the deed saying that they were to get twenty thousand dollars in money; that he did not hear defendants say anything about the eighteen thousand dollar property on Grand avenue. When defendants refused to make the deed, witness said to them: "We will count the money out and tender it to you and of course if you don't give the deed, we will have to bring suit on the contract." That the money was then poured out on the floor and counted; that after that defendant's husband said they would execute the deed if Mr. Ennis would make some concessions with regard to the payment of some of the taxes and about letting the defendants stay in the premises for a while without paying any rent; that Mr. Ennis agreed to make the concessions. Witness then told defendant's husband that he would not accept a delivery of the deed unless defendant's attorney was present and advising them so that they would know exactly what they were doing when they delievered the deed and that thereupon Mr. Alport sent either his daughter or his son-in-law to telephone for his attorney, and after waiting awhile and the attorney not arriving, either the daughter or the son-in-law went out and telephoned again and in a little while Mr. Hock came in. After Mr. Hock came he consulted with defendants, aside from the rest of the party, and after the consultation the attorney, Mr. Hock, informed Mr. Ennis that defendants were willing to make the deed; that the deed was signed and Mr. Alport's acknowledgment was taken first; that when the notary, Mr. Hock, went to take Mrs. Alport's acknowledgment, he heard her say: "I don't acknowledge this to be my act and deed," and that thereupon witness said: "If she don't acknowledge it to be her free act and deed, we won't accept it;" that after waiting awhile, Mrs. Alport finally acknowledged the deed to be her free act and deed and the deed was

261Mo22

then delivered. Upon cross-examination the witness was asked if it was not their pre-conceived plan to make the tender in gold because the sight of gold "was likely to have a strong effect on a Jew." To this the witness replied that such was not their intention but that he had advised the use of gold so that there could be no question about the legality of the tender; that he had never seen the defendants before going down to make the tender; that the sight of gold did seem to have a certain degree of fascination to Mr. Alport but that the gold did not seem to have any effect on Mrs. Alport; that the conversation between Mrs. Alport and her husband was in Hebrew and the witness could not understand what they said in their conversation with each other; that after the deed was signed and delivered the parties all went up to the bank to have the count of the money verified; that the defendants seemed to be perfectly satisfied with the transaction when the money was being counted at the bank. William G. Hock, the attorney and notary who took the defendants' acknowledgment to the deed, testified that at the time the deed was signed he was officing with attorney Leon Block; that at Mr. Block's request the witness prepared the deed; that when he prepared the deed he had the contract for the sale of the property before him; that at the bottom of the contract for the sale of the property, Mr. Block had placed his "O. K." and that some of the interlineations in the contract for the sale of the property were made in the handwriting of Mr. Block; that one of these interlineations was: "The sellers have possession of property for two months from delivery of the deed at a monthly rental of twenty-five dollars and purchaser assumes all interest on encumbrance from date of delivery of deed." That prior to this transaction the witness had seen Mr. Alport in conversation with Mr. Block at the office but did not remember seeing Mrs. Alport there, and did not know

Nelson v. Alport.

whether she had consulted with Mr. Block about the matter or not; that before going down to Mrs. Alport's place of business on the day the deed was signed, Mrs. Alport's married daughter called him over the telephone and told him to hurry down and close the deal; that he was detained for a short time on account of other business and Mrs. Alport's son-in-law called him over the 'phone and also requested him to hurry down. That when he arrived at Mrs. Alport's place of business he found Messrs. Ennis, Adams and Thomas, Mr. and Mrs. Alport and their daughter and son-in-law there. The gold had been counted before his arrival and replaced in the valise. Witness afterwards saw the gold at the bank. That Mr. and Mrs. Alport objected to executing the deed at first. Upon being asked what reason Mrs. Alport gave for not wanting to acknowledge the deed the witness said: "Well, her reasons were, as I remember them, that she didn't think she was getting enough for the property, and the other reason that Mr. Nelson, they understood later that Mr. Nelson was going to be the owner of this property and they didn't know it at the time of the sale, and another party right next door had gotten more for their tract of ground and they thought they ought to have more. That is my recollection of the reasons that Mrs. Alport gave at that time." After the deed was signed the witness asked Mrs. Alport if she acknowledged the same as her free act and deed and that: "At first she said, 'I signed it but I didn't do it because I want to,' and I said, 'That won't do Mrs. Alport; you have to acknowledge it as your free act and deed before I can take your acknowledgment,' and she said, 'Well, I signed it all right,' I don't remember the exact words but to the effect that you can put your seal on there if you want to, and some one spoke up and said that was an acknowledgment and I said, 'No, I won't take that,' and she and her daughter con-

versed about the matter and I told her that they had signed a written contract to convey this property and she told me then that she wanted to get more for it, and I told her I didn't see how she could if she had signed a contract stating the price she was to get for it and if they tendered her what she had agreed to sell it for I thought it was her duty to sign the deed, and she then finally says, 'I do acknowledge it as my free act and deed.' I was particular because of the fact that a tender was being made." The witness filled out the acknowledgment and took the deed to his office where he placed his notarial seal thereon and later in the day delivered the deed to Mr. Ennis; that before the deed was signed the witness made some interlineations therein to the effect that the grantee should pay some city taxes and park assessments; that there was no change made in the deed after the acknowledgment; that after the deed was executed the witness thought that Mrs. Alport said that she wanted to put the money in the vault of the German-American Bank but that she was not dressed to go herself and said that "we" could go on and she would come later; that the bag of gold was taken down to the bank, Mrs. Alport following in a few minutes and after she arrived at the bank the money was counted out. The son-in-law seemed to be doing the counting of the money. On cross-examination the following occurred (Mrs. Alport's attorney asking questions):

"Q. Mr. Hock, hadn't Mr. Alport been up there and told you that he wasn't going to sign that deed? A. He didn't put it in that way.

Q. How did he put it? A. Do you want me to state?

Q. Yes. A. Well, of course, our office was his attorney and that is the reason I asked you that question. Mr. Alport said that he thought he could get more money out of this than the contract provided for and

he wouldn't sign the deed. He came to me and says: 'Can't you break that contract.' He says, 'If you will get me out of that contract I will give you five hundred dollars.' I says, 'Mr. Alport, as far as I know the contract was entered into fairly and I wouldn't undertake to do it.'

"Q. Did he tell you at this time that Mrs. Alport wouldn't sign the deed? A. He said she wasn't going to sign the deed; that she would get out of it some way."

That sometime before the deed was executed, Mr. Alport told the witness that Mr. Ennis told them that they could buy another piece of property on Grand avenue for eighteen thousand dollars but that it had since been sold and he wasn't able to get it; that Mr. Alport did not claim that this was a part of the original agreement but that, "Mr. Alport seemed to think that he made a mistake in selling this property for the sum he did. He said he didn't know at that time; he said that he afterwards learned that Nelson was buying up the ground around there and if he had known it and held it he could have gotten a bigger price, and he went on to state that he took this price for it and thought it was a good price at that time but now he didn't, and he was a fool for making the agreement that he did."

Tennyson Thomas testified that at the time of the transaction he was connected with H. R. Ennis & Company; that he and Mr. Ennis called upon defendants for the purpose of trying to purchase their property and that defendants finally agreed to take twenty thousand dollars for the property, fifteen thousand dollars in cash and the balance to be paid by the assumption of the five thousand dollar mortgage on the place; that the original contract was submitted to Mr. Block before it was signed, because Mr. Alport would not sign it without Mr. Block's "O. K."; that the witness took the contract to Mr. Block's office and Mr.

Block had a conversation with Mr. Alport over the telephone, after which Mr. Block made some interlineations in the contract and then placed his "O. K." thereon. The witness then took the contract to defendants and read the contract over to Mrs. Alport and asked her if she understood it and that she seemed perfectly willing to sign the contract. The witness kept one copy of the contract and the defendants the other. That a few days later Mr. Alport told him that they would not execute the deed because he thought he was to get twenty-five thousand dollars for the property instead of twenty thousand dollars. The witness further testified that defendants did not agree to sell the property upon the condition that Mr. Ennis would sell them the eighteen thousand dollar Grand avenue property but that they did have an option on that property and were willing to sell it to the defendants and urged them at several different times to purchase the property at eighteen thousand dollars but that Mr. Alport said that he knew what property he wanted to buy and that he would buy a piece of property for about seven thousand five hundred dollars; that Mr. Ennis made a sale of the other Grand avenue property on June 17th; that Mr. Nelson did not care to buy the property at 1707 Grand avenue but that Mr. Ennis had procured an option on it and the firm was to make a commission of five hundred dollars in cash if they found a purchaser and that they were trying to sell it to any one who would buy it. The witness was present when the deed was executed by defendants; that Mr. Adams did most of the talking to defendants and refused to take the deed unless defendants had their attorney present and that some one telephoned for Mr. Hock; that he could not understand the conversation between Mrs. Alport and her husband because of their using a foreign language; that finally Mrs. Alport agreed to sign the deed and did sign it and that when Mr. Hock went to take her

acknowledgment Mrs. Alport said it was not her free act and deed; that thereupon Mr. Adams told her and her husband that they did not want the deed unless it was of her free act and deed; that after that Mr. Hock talked to Mrs. Alport a minute or two and she then acknowledged it as her free act and deed. The witness and defendant's husband then got upon a street·car and took the grip containing the money to the German-American Bank at Fourteenth and Grand avenue. The witness further testified that the one thousand dollars required to be deposited by the terms of the contract of sale was deposited with H. R. Ennis & Company as stated in the contract and that the one thousand dollars was paid to them by Mr. Nelson's agent, Mr. Seested. H. C. Edward testified that he was present when Mrs. Alport signed the original contract for the sale of the premises and that Mr. Thomas read the contract over to her and explained its provisions to her and that after the contract was signed and just as witness and Mr. Thomas were leaving, Thomas said to Mr. Alport, ''I would like very much to sell you another piece of property and I want to know when we can get together and go over the proposition.'' That Mr. Alport replied that he ''did not care to figure right then but would see Mr. Thomas later;'' that was all that was said about any other property at the time the contract was signed. The witness was also present at Mrs. Alport's place of business when the tender of fifteen thousand dollars in gold was made but left before the deed was signed. This witness, in substance, corroborates the testimony of plaintiff's other witnesses with reference to what occurred on that occasion. On cross-examination this witnesss further testified that at the time the contract for the sale of the property was made defendant's daughter read the contract over to Mrs. Alport and explained· the contract to her, partly in English and partly in Yiddish, and that Mrs.

Alport said that she understood it; that the property at No. 1707 Grand avenue was not referred to at that time; that after the contract was signed and before the deed was executed Mr. Alport was at the office of Ennis & Company one day and the Company through their salesmen attempted to sell several pieces of property to Mr. Alport; that one piece of property offered at this time was the property at 1707 Grand avenue, the same being offered at a price of eighteen thousand dollars, but that Mr. Alport refused to do anything in the matter and said he did not want to buy at present. H. R. Ennis testified that he was not present when the contract of sale was executed by defendants but that he negotiated the matters preliminary to the signing of the contract and that the contract as signed expresses the agreement which he and defendant reached concerning the sale of their property. Some time after the contract was signed, Mr. Alport came to the witness's office and delivered an abstract to the property; that Mr. Alport was in the office of the real estate company often between the signing of the contract and the execution of the deed; that at the time the contract of sale was signed on June 5 and up until June 17, the witness's real estate firm had the sale of the property known as No. 1707 Grand avenue at a price of eighteen thousand dollars; that the firm attempted to interest a number of people in the purchase of this property, among others, Mr. Alport, but that Mr. Alport said he did not want to buy property on Grand avenue because it was too high and another reason he gave was that he did not like the Jew who lived next door to No. 1707; that after trying to sell the property to a number of persons the firm succeeded in selling the propety on June 17th, for the sum of eighteen thousand dollars and the firm received a five hundred dollar commission out of that; that the firm did not receive any commission in handling defendant's property; that a day

Nelson v. Alport.

or two prior to the defendants executing the deed, witness had notified Mr. Alport that they were ready to close the deal and Mr. Alport had agreed to meet them at Mr. Block's law office; that Mr. Alport failed to keep his appointment; that thereupon the witness consulted Mr. Adams and Mr. Adams said, "We had better get within our rights and make a tender;" that Mr. Adams "looked after all the legal ends of the transaction." That witness requested Mr. Adams to go with them to make the tender; that they discussed whether they would take United States Treasury notes or gold and that Mr. Adams said: "Rather than have any question about it, the best thing to do would be to take gold; that can't be questioned;" that after the tender was made defendants refused to execute the deed, saying that they were not getting enough money for the property; the witness details what occurred, as follows:

"We told them, at least I think I did, that they made a contract and we thought it was good, and if they didn't sign it we were going to endeavor to enforce it through the courts. There was a good deal of talk back and forth. Mrs. Alport talked to her daughter and her daughter wanted her to sign and her husband wanted her to sign and, finally after we agreed to pay the taxes, pay the special taxes for paving and some other taxes, I have forgotten what they were, she said she would sign. At that time Mr. Adams suggested and said they ought to have their attorney there, and either the son or the daughter went out and telephoned—son-in-law or daughter—and eventually Mr. Hock came in and she signed the deed. After the thing was explained to him and he asked her if she acknowledged this as her free act and deed, she said, 'I signed the deed but I don't acknowledge it as my free act,' and he said, 'I can't take the acknowledgment unless it is acknowledged as her free act.' And I said, 'Mr. Hock, as long as she

signs it, isn't that a good deed?' and he said, 'No, she has to acknowledge it as her free act and deed.' And Mr. Adams spoke up and said, 'We don't care for the deed unless it is her free act.' And she then, after conferring with her daughter and Mr. Hock— her husband didn't talk to her at that time—she signed the deed and acknowledged it and held up her hand and signed it. . . .

"Q. Did you say anything or make any threat to Mrs. Alport to induce her to sign that deed? A. The only thing I said was that we had made a contract in good faith, a contract had been made in good faith and that Mr. Nelson would try to enforce the contract."

Witness further testified that before the deed was finally executed he made concessions to defendants which were not required in the contract of sale. One of these concessions was with reference to his paying some special taxes amounting to three hundred and twenty dollars and city taxes amounting to about fifty dollars, that when Mrs. Alport executed the deed she asked witness about the rent on the place and witness told her that he would allow her to use the premises for two months without the payment of any rent and that Mrs. Alport wanted a receipt for it and thereupon witness wrote upon the back of the contract a statement to the effect that Mrs. Alport had paid fifty dollars rent for two months; that after the two months had expired they continued to occupy said premises and paid rent for August, September and October, paying twenty-five dollars a month for two of said months and thirty dollars for one of said months; that thereafter defendants refused to pay rent and defendants were given notice to vacate the premises. .

Appellant contends that the findings and decree of the court are erroneous because they are "against

Nelson v. Alport.

Conveyance by
Married Woman:
Fraud: Evidence.

the weight of the evidence" and "contrary to equity and good conscience."

Since the above is the decisive question in the case it became necessary in making the foregoing statement of facts to set forth, more fully than would otherwise be necessary, the testimony of the respective witnesses.

We have carefully and painstakingly reviewed the entire evidence and have reached the conclusion that the weight of the evidence is in support of the decree entered by the trial court. It would serve no useful purpose to discuss at length, or in detail, the weight of the evidence but it is perhaps not amiss that we should discuss some of the main features of the testimony which leads us to the conclusion reached.

The case is mainly built around the following controverted issues of fact: (1) Was Mrs. Alport fraudulently induced to sign the original contract under the belief that her obligation to sell or convey her property was upon the condition that she was to receive the title to another property in the same block for the sum of eighteen thousand dollars? (2) Was she caused to sign the deed by reason of the alleged fraud upon the part of Mr. Ennis? (3) Did she properly acknowledge the deed?

In the view that we take of the case it will not become necessary to determine whether Mr. Ennis was so far the agent of plaintiff as to bind or affect the plaintiff by whatever was done by Mr. Ennis in the transaction, but for the purposes of the discussion we will assume that he was such agent.

With reference to the first question of fact the evidence was as stated by appellant in her brief "irreconcilably contradictory." But the fact that defendant in her sworn letter to Ennis based her refusal to surrender possession on the ground that she was to have twenty thousand dollars, net, under the con-

tract and was therefore entitled to five thousand dollars additional money, and in said letter made no mention whatever of her present contention, to-wit, that her grievance was based upon her failure to be allowed to become the purchaser of the eighteen thousand dollar property, would strongly indicate that the claim now made was an afterthought.

With reference to the second issue of fact, defendant testified that she signed the deed not because of threats of suit, etc., made by Mr. Ennis but that she was coerced into signing the deed by reason of the threat made by her husband that he would leave her and the children if she did not sign the deed. It appears that the alleged threat upon the part of the husband was made in a language not understood by Ennis and his associates. It is not contended nor does the evidence show that Mr. Ennis urged or procured the husband to make such a threat, but it is insisted that the act of Ennis and associates in making tender of the agreed purchase price in gold so operated upon the mind of the husband as to cause him to make the threat.

That the person making the tender was within his legal rights in making the offer in gold cannot be seriously doubted. But the fact that it was so made and the manner in which it was made might well cause a court of equity to carefully scrutinize the situation and to make mental tests for traces of fraud, and if the weight of the evidence should show other matters indicating suspicious circumstances, undue coercion or fraud, this somewhat unusual occurrence and therefore suspicious circumstance might throw added color upon the transaction. But where as here this slightly suspicious circumstance is not supported or surrounded by an atmosphere of fraud or suspicious circumstances, we do not regard the matter as having much weight. In fact, defendants' evidence does not show that the threat was the result of the sight

of the gold. Whether the threat, if made, was caused by reason that the husband thought they were bound by the original contract, or convinced by advice of their attorney that they should do so or by reason of the sight of the gold or other reason is left to conjecture. We would indeed be reluctant in believing, in the absence of clear and cogent proof, that defendant's husband, a Hebrew, and, no doubt, possessing in common with the great majority of mankind in this somewhat material age a strong appreciation and desire for possession of gold, would be so far overcome by the sight of and the thought of the near possession of gold and so far forget himself as to violate that most sacred trait or characteristic of his race and people, to-wit, undying loyalty and fidelity to wife and family, by threatening in such a manner as would *convince* his wife, his lifelong and business companion and helpmeet, the mother of his children, that unless she signed the deed he would forsake and abandon her and the children. This contention is lacking in genuine ring. It smacks too much of an ingenious subterfuge to call for much activity upon the part of a court of conscience.

As to the third point there is also an irreconcilable conflict in the testimony. Mrs. Alport testified that she refused to acknowledge the deed as her free act and deed. The notary, Mr. Hock, testified that she did acknowledge the deed to be her free act and deed. There is nothing in the record that discloses anything in the least suspicious about Mr. Hock's part in the transaction. It appears from the testimony that Mr. Hock was connected with the law office of Mr. Block; that Mr. Block was acting as the attorney for Mrs. Alport in passing upon the form of the original contract and in drawing the deed which Mrs. Alport signed, and that Mr. Hock, in response to a telephone call from Mrs. Alport's daughter, came to defendant's place of business just before the deed was

signed; that after arriving there he held consultation with Mrs. Alport and her husband aside from the other persons present and advised with them as to the propriety of their signing the deed. Mrs. Alport's subsequent actions are somewhat inconsistent with her claim that she did not acknowledge the deed. She followed the money down to the bank and was there while it was being counted and deposited in a safety deposit vault. Later some of this same money was used to purchase other real estate and the title thereto was taken in her name. It does not appear that she made any protest at the bank when she saw the money being delivered by Mr. Ennis or that she made any objections when the title to the after-purchased property was taken in her name.

When the above matters are considered in connection with the fact that the testimony on the important issues presents sharp conflicts, making the credibility of the respective witnesses an important factor in determining the real facts in the matter, and the further fact that the trial judge had an opportunity of seeing and hearing the respective witnesses, we are unable to say that his finding was wrong and therefore feel no hesitancy in affirming the decree entered below.

The judgment is affirmed. *Roy, C.,* concurs.

PER CURIAM.—The foregoing opinion of WILLIAMS, C., is adopted as the opinion of the court. All the judges concur.